It's open today, so we'll hear you, Mr. Cicarella. Good afternoon, Your Honors. My name is Michael Cicarella. I represent the, uh, the appellant, uh, plaintiff in the lower court, Kimberly Latterborn. Uh, this is an appeal, uh, on October 30, 2006, opinion and order of, uh, District Court Judge Malcolm Muir. Uh, I reserve five minutes for rebuttal. There are essentially, uh, uh, the essential points of this case, it was a summary judgment motion on behalf of the defendant that was granted by the trial judge. The facts of the case were viewed in the light that was favorable to the plaintiff revealed that the court erred in granting the motion for summary judgment. And there are three, there were three real issues, uh, in the case. First, the lower court concluded that no reasonable finder of fact could conclude that the defendant, R&TMechanical, had failed to exercise reasonable care to prevent and correct promptly sexual harassment behavior. Uh, and it relied upon, uh, an affirmative defense as described by the court, uh, the Supreme Court in, uh, the Pennsylvania State Police v. Suitors. Uh, the affirmative defense, uh, in these types of cases where there's no tangible employment action, uh, would require that the employer exercise reasonable care to prevent and correct promptly any sexually harassing behavior and that the plaintiff employee unreasonably failed to take advantage of any preventative corrective opportunities provided by the employer to avoid harm otherwise. Uh, and it's that second, uh, element that the judge had, uh, relied upon. And the court actually stated the unwavering sentiment consistently expressed by those employees, uh, reflects a corporate culture in which the employee were well aware that Baumann, Timothy Baumann, president of the company, was receptive to such concerns that he would not tolerate sexual harassment. And the court didn't really go on to cite the specific testimony, but when you review the testimony, uh, it's really quite the opposite. Was there a policy that was in existence here, Mr. Zicalolo, because I believe you argue in your brief to us that the district court erroneously found that R&T had an anti-harassment policy. Is that correct? Uh, that is our position. Uh, no employee was aware of a sexual harassment policy, and I think there was a... All right. Well, the district court did, uh, reach that conclusion or make that finding, uh, at, uh, at page 18 of its opinion. Uh, in fact, it's not really a finding. I think the district court's conclusion was that you conceded that element before the district court. Was it not? I don't believe that we did concede that element. Uh, they cited to language contained in their manual that, uh, they did not, uh, tolerate immoral, uh, conduct. Well, did you raise the issue of a lack of anti... of an anti-harassment policy before the district court? It was in our brief, uh, the motions for summary to your brief, that no employee even indicated they were aware of a sexual harassment policy. Uh, Robert Savage, the, uh, general manager of R&T North stated he wasn't even aware of one. Well, didn't he also say he had an open-door policy and that if anybody had a complaint they could come in? And isn't it the fact that when Ms., uh, when he heard, I guess he heard it from Weiler and then, um, from Savage who admitted the harassment, he fired him. I mean, what more could you do than fire him? Well, the point here is that while the conduct was going on, while, while Robert Savage was in charge at R&T North, Timothy Baumann, according to the testimony, was rarely there. Uh, some of his employees testified he could go three months before he would show up. And during that time, Robert Savage painted Timothy, uh, Baumann, whether true or not, as an ogre, that if you complained to him, you wouldn't be fired. In fact, Judy Hinton, the only other employee at R&T North who Robert Savage did the exact same things to, testified she didn't go to Timothy Baumann because she was convinced he would fire her if she said anything. So Robert Savage successfully painted Timothy Baumann, whether true or not, as someone who just fired somebody who came to him with this type of complaint. But under the Supreme Court's decision, did she have an obligation to take preventive action, i.e., try to see Baumann and tell him? Because isn't that her responsibility under the law? I think she had an obligation, uh, of a reasonable person in her situation. And when you look at her situation and the only other female employee there, Judy Hinton, Judy Hinton came to the exact same conclusion that Kimberly Latimore came to, that you can't go to Timothy Baumann. So I think that shows that her conduct was reasonable. Uh, and it's for that reason that we don't believe that, uh, that the defendant can satisfy the affirmative defense because she didn't unreasonably fail to take advantage of any protective measures. She was led to believe that if she did anything, she'd be fired, uh, just like, just as Judy Hinton concluded, the only other female employee. Uh, the, the second, uh, issue is that the court erred in, uh, concluding that R.T. McCaskill had met its burden of proving that Kimberly Latimore had unreasonably failed to take advantage of preventative and corrective opportunities. That's the same argument, really. Uh, that if, even if, even if they were supposedly available, everyone up there at R.T. North was, was led to conclude by Robert Savage, who was in charge at R.T. North, that there was nothing available to you, that he called all the shots and that he was protecting them from Timothy Baumann because Timothy Baumann was somebody who wasn't going to tolerate anything and would fire you if you made a complaint to him. Uh, the, uh, the third issue goes to retaliation. The court found that no reasonable finder of fact could conclude that a causal connection existed between, uh, Timothy Latimore's report of sexual harassment, uh, and her adverse employment action. I think, and the court And the court was referring to what occurred down in Alabama. Alabama, yeah. And I don't think that you need to, this is not a situation you need to review in a vacuum. You have to take the, the entire timeline and situation as it stands. What's your understanding of what happened? Um, there's certainly evidence that in the course of that conversation, she walked out. Is that, is there not evidence of that? There is evidence of that. There is also evidence in the form of, uh, the testimony of both Kimberly Latimore and, uh, Timothy Baumann that it was at that point in time that he told her, uh, he was laying her off. Uh, he never called her back. Okay. And Kimberly, Kimberly Latimore said that when she made the reports of which she believed to be sexual harassment, because of retaliation, she has no reasonable belief that it was sexual harassment. It doesn't have to be sexual harassment. Okay. Well, let's, let's say, okay, so he laid her off, whether permanently or not is an issue that's not clear. Um, did she, is there anything on the record to show that she made any effort to clarify this, her status? That, did, did she try to get back in? Uh, did she write to them? Did she say, can I come back? Is there a job for me? There is nothing in the record. She was laid off, but people were, they hired people. She was never recalled. Yeah, but she never, then we can assume she never, at least she never showed that she asked. Well, there was no testimony that they ever attempted to recall her for employment as well. Well, but go back to the statement that you said before, which is that the employee has an obligation to take preventive action. Now, if her complaint is that she was laid off, um, how do you answer the claim that she didn't do anything to take preventive action? I mean, uh, knowing that they were hiring other people, um, one could ask why she didn't at least apply, communicate with them, say I was laid off, but you're hiring other people. I think that I'm a good pipe fitter or whatever it was she did. I think that, that's something to go to her obligation to mitigate damages. I mean, the still, the proof would be that the layoff at that point in time, the reason was the, the retaliation because her own testimony says that when she tried to explain what was happening in Alabama, that, uh, Timothy Bauman held up his hand and said, you know, I, what do you want me to do? I spent a lot of money training these guys. And that's exactly what Arthur Weiler said. He told him when, after Robert Savage was fired, he brought up the incident with respect to an employee saying he would only give t-shirts to women who did certain things for him. Uh, he said, what do you want me to do? Fire all these guys? Fire everyone? And that was the testimony. I think that all falls in line consistent. I think, I think the defendant has many good factual arguments they can make to a jury, but I do think there's a, there is sufficient evidence here to allow a jury to make the determination. If we may go back for a moment, Judge Diamond, if we may go back for a moment. We now, we see you. Go ahead, Dustin. I'm sorry. Go ahead. Go ahead. Uh, with regard to whether she took preventative actions that were available to her, uh, Weiler, her immediate supervisor, according to the opinion of Judge Muir, repeatedly, uh, uh, told her that she should be reporting this to, uh, Bachman. And in fact, Weiler wanted to do it himself. But she literally, she begged him not to do it. Uh, she was told, she was guaranteed by Weiler that if she, uh, did report it, she would not be fired. How do you get around that? I think that you have to judge her conduct as a reasonable person or situation. And when you look at the situation that Bachman is never around, that Savage is in charge at R&T North and paints himself as, as Bachman's best friend and buddy, and the only other woman there who, who Savage does the same exact thing to, Judy Hittman, arrives at the same conclusion, I can't report this because I'm the one that's going to be fired. I think you have to judge it in that context. But Weiler assured her that she would not be fired. Weiler worked for Savage. He was under him. And at that point in time, she believed that Weiler was also very good friends with Savage and didn't know if she could trust him anyway. Because at that, at that point in time, the belief was that Savage was grooming Weiler to take his place. He was willing to go out on the limb and report, uh, uh, Savage's conduct. Was he not? Well, he did eventually. Yes, he didn't, didn't initially. He wanted to do it. He wanted to do it earlier. But I think that's a problem that, that R&T had with Mr. Weiler, that, that he should have reported it earlier. But that's, I think that's his issue, not hers. So she, she contributed to that. She begged him not to do it. Do you want to try to respond to that? Yeah, I think that it's true she begged him not to do it. Because when you put, when you look at the situation, that was the reasonable conclusion she reached, that if he reported it to Baumann, she would be fired. Because Baumann was successfully painted as an ogre, essentially, by Savage to both Hittman and, and my client. Okay. Under what circumstance, then, would you have a person who was able to protect themselves if they're, if they're going to have a fear that is apparently unfounded? How do you get her, how does the employer ever protect themselves? I think that, I think that's important. If the fear is unfounded and unreasonable, I think you are correct. But in this context, the fear was reasonable, as evidenced by the fact that Judy Hittman had the same exact fear. I think you have to judge the reasonableness of the conduct. Judy Hittman asked her, urged her also to report it, did she not? But Judy Hittman herself wouldn't. She was afraid to report it as to herself. She wouldn't want somebody else to take the bullet for her. Wow. Judge, you have stated that Judy Hittman requested it, or advised her on a number of occasions to report, and she didn't. I think if, if you reviewed Judy Hittman's own testimony, the same stuff happened to her, and she didn't report it for the same fears that, that Kimberly Latiborne had. Okay, Mr. Ziccolello, you saved a big portion for rebuttal, so we'll get back to you. Mr. Henry? Your Honors, may it please the Court, my name is Sean Henry. I represent RIT Mechanical in this appeal that's brought by Mr. Ziccolello in this case. This Honorable Judge, Judge Muir, did in fact properly rule in this case, and in fact he ruled based on all of the undisputed facts in this matter. Defendant filed an undisputed facts, a statement of undisputed facts, and in that statement of undisputed facts, plaintiff never at any time said, may raise this argument about us not having some proper method by which people could report. In fact, Judge Muir was proper in his commentary in saying that matter was never, ever addressed by plaintiff in the case. In fact, the case of Delaware Nation that we cite in our brief clearly states that in situations where an individual waives such an argument at the lower court, that argument is waived here at the appellate level as well. What Mr. Ziccolello did argue was the idea that it was this unreasonableness issue for Ms. Lauterborn, whether or not it was unreasonable for Ms. Lauterborn to have reported. And he said, yeah, this really should not have been unreasonable. Three things we would like to point out there. First of all, as Judge Dimon properly stated, Mr. Weiler did in fact tell Ms. Lauterborn to report, and in his own testimony he said he told her many, many times. That was Mr. Weiler's testimony. Ms. Lauterborn says the same thing, that Weiler told her those things, to report and that she would in fact be protected. There was Judy Hittman, who you hear Mr. Ziccolello raising comments about her own behavior on a number of occasions. In fact, Judy Hittman did not have the same position as Ms. Lauterborn did. Judy Hittman did not see Mr. Savage anywhere near as often as did Ms. Lauterborn. She worked in an office, and occasionally, certainly, Mr. Savage may have said things or done things to her. He sounds like a real ogre. He was Mr. Savage, certainly. Certainly he was not the best of folks, and he was fired on the spot, as the judge properly mentioned when we learned of the issue. But in fact, there was another employee, Roger Hurd, a male employee, who came to Ms. Lauterborn and explained to her, Ms. Lauterborn, you should report to Tim Bachmann. While we hear this commentary about Mr. Bachmann not being present at the workplace, most employees said Mr. Bachmann was there monthly, at least once a month. This situation took place over the course of five years. That's 60 times she saw Mr. Lauterborn, Mr. Bachmann, 60 times. In 60 times, she couldn't turn around and say something. We'd like to also point out the fact that at one point in 2001, I believe it was, sorry, 2002, Mr. Weiler did, in fact, confront Mr. Savage. And when he confronted him, all that Savage said, although he often would have said to Lauterborn, you know, you better not report. These bad things are going to happen to you. All he said to her was, you should have kept your mouth shut. Nothing happened to her in terms of a job. She didn't lose her position. She didn't fail to get promoted. In fact, her husband was later promoted to being the shop foreman. Mr. Henry? Yes, ma'am. What is your position as to what happened in that final meeting between Ms. Lauterborn and Mr. Bachmann? How did it end? Yes, ma'am. Once again, Michael and I love each other, but the reality is we have a different view of what happened here. We believe that the facts... Well, what's on the record? Right. We believe that the facts will support our position. And our position in this is simply that if you read Ms. Lauterborn's testimony, she's asked, when I proposed her, she's asked, did Mr. Bachmann ever tell you you were fired? She said, unequivocally, no. Then she was asked, did he ever tell you you were terminated or should he be laid off? She said, no. She was so upset, she turned around and walked off. And in fact, the testimony is that Mr. Bachmann then said, is this the end of our conversation? She did not reply. More importantly... Mr. Judge? Mr. Judge, raise the issue, if I may. One second, Judge. Sure, go ahead. Another important fact about the Alabama conversation that is completely glossed over by plaintiffs is the fact that Ms. Lauterborn lied about returning from Alabama. She didn't check with the other supervisor. I'm sorry? She didn't check with the other supervisor. Oh, no, not just that, ma'am. When she talked to Timothy Bachmann on the phone, she did not say, I believe I'm being harassed down here by people who do not work for you. She, in fact, said, you know, what's happened here is that my son has a problem back in Alabama, and Mr. Bachmann properly explained to her, and by the way, she admits it's in our statement of material facts, it was not disputed by plaintiffs, nobody wanted to be in Alabama. They were having problems down there on the job. They needed people on that job. They couldn't afford to lose people from the job. Bachmann told her just that. She said, I need to come back anyway. Never mentioned sexual harassment, not once. We should point out that after the first incident, after the incident of Savage, even if there were earlier issues where perhaps Bachmann was paying the negative light, et cetera, Bachmann went to each of those employees, and all of the management employees were reprimanded, every one of them. And Lauterborn was given a written letter that says, please talk to me any time you have a sexual harassment issue. You hear Mr. Sicalillo discussing the issue that Weiler supposedly tried to report an issue of a person that had said something about a T-shirt and what he would do, what a woman would have to do to get a T-shirt. In fact, that occurred some months before Weiler attempted to report it. In fact, it had occurred even before Savage's termination. And Weiler chose to raise this issue only when he was being questioned about the performance down in Alabama and the fact that the job was waning. Can I return to the final conversation? Yes, ma'am. After the final conversation, taking your position as to what happened, when the company began to rehire people, did they ever, is there anything on the record that shows that they ever solicited her re-employment or re-application? There is nothing on the record. In fact, the company did not solicit Ms. Lauterborn's rehire. In fact, we believe she walked off the job. Bachman told her, if you return to work, I may not have work for you. Her comment was, I know, that's why I came in my civilian clothes. These are Ms. Lauterborn's comments. These are not the comments of our client. In fact, it was Ms. Lauterborn who said, Mr. Bachman never fired me and he never terminated me. I turned around and walked out. When Mr. Bachman said, and Mr. Zickelelow I think mentioned this as well, he said, how can I believe you, Kim? It was in direct response to the fact that Kim had lied to him three days earlier. What's the issue with respect to whether it was, whether he said permanently laid off or not? Because there's an issue of fact as to that, isn't there? No, ma'am. He never said the words laid off. When this dispute comes in, in fact, it is in Mr. Bachman's testimony, where he's asked by Mr. Zickelelow, did you lay her off? When he says he didn't remember, it was so much longer ago. Plaintiff herself, however, when asked, were you laid off by Mr. Bachman, said no, unequivocally no. Did he ever fire you? No. Those were the words. It's in our brief as well. Again, what we have here is a situation where we have, a situation where the employer clearly had every possible effort for these people to go ahead and report. Now, the judge asked her a moment ago, Judge Smith, asked about the idea of the possibility that was there, in fact, a sexual harassment policy. In fact, in our statement of material facts, undisputed by plaintiff, what we argue is that there was an open-door policy and, in fact, there was also a policy against immoral conduct. This policy was known to all, and including Ms. Lauterborn, was known to her as well. These issues of why Lauterborn left Alabama, supposedly, she says later on that she learned that these people were talking about her, that her own employees were talking about her. In her own testimony, she says she didn't know that until after she came back. Once she was back in Pennsylvania, she was spoken to by Mr. Weiler, and Mr. Weiler at that point said to her, you know, these people have been talking about you down here. Had nothing to do with why she left. Had nothing to do with why it was that she was terminated. She lied to the boss. Gus, do you have any questions of Mr. Henry? No, not really, although... Do you have some that are real? Yes. Go ahead. When the plaintiff spoke to Bachmann from her employment in Alabama, and she said she wanted to come home, and he gave her instructions that she should remain and, in any event, he told her that he didn't have any work for her up in North, that she were to come North. He told her at that time, did he not? Before she had ever made any statement to him concerning sexual harassment in Alabama. He said, I may not have work for you if you return to Pennsylvania. Obviously, Alabama was the job that they had put into place at the time. They had, in fact, invested a number of resources there. He said that. There's some argument that, in fact, she could have worked, and I think plaintiff will say to you that she could have worked for her husband who worked in the fabrication shop. They were fabricating items to send to Alabama. And so that, I believe, would be plaintiff's argument that that work might be available. The bigger point, however, was that they were shorthanded in Alabama, and none of the employees wanted to be there. As I like to say, it's Alabama. At the end of the day, you'll want to come back. Of course, there is some political... There's actually some nice things to be said about my people, but it's not... But some political person said that the space between Pittsburgh and Philadelphia is Alabama. We're referring to the places where some of us live. Well, I'm from Philadelphia. Another point that we would like to make is that R&T Mechanical, from their perspective, certainly had every opportunity for Ms. Lahr going to report these activities at any time. And, in fact, she knew, as I mentioned earlier, well after, or immediately after, Savage's termination, she was aware of the fact that Mr. Bachman would address these issues. It's pointed out even more clearly and more poignantly by the fact that Mr. Bachman, when asked, rather, why she didn't report to Mr. Bachman on the telephone, she said, because I knew he'd come down here and talk to those guys. So we asked her further, why didn't you go ahead and let him do that? Why didn't you come down here and talk to those guys? Well, I really didn't want to have to face what they might have said to me. I didn't want to have to deal with those issues. And I didn't want to have to deal with the fact that, you know, maybe Mr. Nagy, one of the other managers there, may have given me a hard time, things along those lines. But, yet, she testifies that those guys never actually talked directly to her. She never knew anything about those issues. According to her testimony, Mr. Weiler told her not to ask Mr. Nagy. That's true. She does say, actually, no, it's Mr. Weiler that says that. When she says, when asked about it, in fact, in Plymouth's brief, he argues that Ms. Lauterborn said those things. Ms. Lauterborn did not say that in that position. It was Mr. Weiler. Mr. Weiler, when asked, said, I told her not to go to Mr. Nagy. But, in fact, it was Ms. Lauterborn who said, when asked, she said exactly what I just told you. I wasn't going to go to Tim because he asked me to go to, excuse me, I wasn't going to go to Nagy because he talked about me. He talked about me all the time. When I asked her, when did you learn he talked about you, I didn't know about that until after I came back to Pennsylvania. At the time she made that decision, she had no knowledge of any comments supposedly made by Nagy. Anything from Pittsburgh? No. Okay. And nothing more from Alabama either. Welcome. Center City, Philadelphia. Thank you, Judge. Unless you have more to tell us. No, ma'am. We're fine. Thank you. Thank you, Mr. Henry. We'll hear the rebuttal. I think it's very important. Wait, wait. Wait until you get on the tape. That's what this is for. It's not only to make you loud. It goes on the tape. Now it's not a tape. It's now a disc. Okay. Thank you. I think it's important to view this case in two sections, the pre-Savage termination and the post-Savage termination. And obviously, I think the defendant has stronger arguments for the post-Savage era that something was done and she should know she can go to Timothy Baumann. Is that the retaliation claim? Yes. But I think you need to look at it all in context. Now, the sad reality of our culture is that it was necessary to pass sexual harassment and discrimination laws. And we're not talking about an office environment or things happened by the water coolers. We're talking about a woman that has just been through  She's put down in Alabama. Wait a minute. Wait a minute. She volunteered to go to Alabama. And that's right. She did. She went to Alabama. She wasn't put down. She went to Alabama. One of the people in charge down there, Greg Nagy, was one of the people spreading rumors about her. Men were looking for her at her hotel. Wait a minute. Hold on. As far as I can tell, and as you can tell, we know the record, there's nothing to show that the people who asked at the hotel, unless I'm wrong, you tell me, were employees of the defendant. Oh, and I would submit that based on what we would know, that they weren't. Oh, okay. But our position is that, you know, the workers for R&T started spreading rumors. She was, you know, I didn't use talk of other women. There were a lot of women down at this Alabama workplace. It was a construction site. But I thought that she didn't know that people were talking about her until she came back. She knew the people were looking for her. Well, those people were not the defendant's people. She didn't know that many men were coming up to her and asking her out and that some of the R&T workers had been spreading rumors, I think. Yeah. I don't know why. I must say, maybe other people think. I mean, for a long time I was the only woman in the law firm. I was the only woman on the Court of Appeals. But I never thought that asking me out, whether I was married at the time or not, was harassment. Why is asking somebody to go to dinner, who happens to be a married woman, evidence of sexual harassment? It's because all of it was part and parcel of her coworkers spreading rumors about her. But she didn't know about that. So I just don't understand the reasonableness of translating the invitation to dinner. Unless it was more, you know, let's go to dinner, and thereafter. But if it was just, are you free for dinner, will you go to dinner with me? I don't know why that's sexual harassment. I think when you put it in the context of unknown men attempting to locate her room in a hotel when she's far from home. Yeah, but that came after. I mean, when she went out there, people started to, as she said, men, the workers would say, will you go out to dinner with me? This isn't raised in the defendant's brief, Appley's brief, but I don't understand the reason. As a woman, a very early woman in this field, I don't see that translation, but that's my experience. Maybe it's not on the record. Go ahead. I just think in the context of what she'd been through before and knowing that all the workers at the site down there, other than really Art Weiler and his son Bud, were all mad that Robert Savage had been fired. They made no bones about it that they were mad at her that he was fired. I think when you put it all in that context and the fact that somebody was calling her name and she indicated, in addition to the two unknown men, that someone was running down the stairs and calling her name at the motel, someone she didn't know. All these things are happening to her. I think she put it all together. I think it's reasonable to conclude. And she had some reasonable fears. Art Weiler, one of the people in charge of her down there, thought it was wise for her to go back. Greg Nagy, an admitted person who was against her, she had no desire to go to him, and Art Weiler was in charge, told her to go back. Timothy Bauman did tell her, and she testified, I might not have worked for you. He didn't say I would, he said I might not. She came in, he heard her. And the statement he made to her that, what do you want me to do, Kim? I've got too much money and training in these guys. I think when you put that together, he didn't say, gee, Kim, that doesn't sound like sexual harassment to me. Maybe we ought to talk about this. His response was putting up his hand to her. They didn't want to hear anymore. I think when you look at that in that context, a jury should get to decide. I think we understand your position. You've made it clear. Thank you. Thank you, gentlemen. We will take this matter under advisement, and you will be notified in due course. Thank you.